JUSTICE TRIEWEILER
specially concurring.
I concur with the majority’s conclusion that the payment agreement between St. John and MEC did not settle their dispute regarding the amount owed by St. John for electrical service. I disagree, however, that that resolves all of the issues which must necessarily be decided on appeal in order to adequately guide the District Court after this case is remanded.
In addition to its conclusion that St. John had settled her dispute with MEC, the District Court also concluded that she failed to show that her meter malfunctioned or was misread. This conclusion was also inconsistent with the District Court’s findings and should be specifically reversed by this Court.
*322 The District Court found that seven days after St. John signed up for electrical service from MEC, she was billed $2040 for 40,000 kwh of service during that time, but that “St. John did not consume 40,000 kwh of electricity ($2040.00) during the period from when her account was opened (August 12, 1993) to the August meter reading (August 19, 1993).”
The District Court went on to find that St. John was later billed $2040 for 40,000 kwh of consumption from October 19,1993, through November 15, 1993, but that the pool, for which the electricity had allegedly been consumed, had been shut down prior to October 19, 1993. Therefore, neither could that charge have been correct. In light of these findings, the District Court’s conclusion that plaintiff failed to show her meter malfunctioned or was misread is incorrect. That conclusion should be reversed and upon reconsideration of this case following remand, the District Court should be directed that judgment cannot be based on that erroneous conclusion.
I would furthermore conclude that the manner in which St. John was treated by MEC in this case was unconscionable and that as a matter of law electrical providers who monopolize electrical service cannot extort payment of legitimately disputed sums from their customers by terminating electrical service until payment is agreed upon. To fully understand just how egregious MEC’s conduct was, it is necessary to look no further than the court’s findings of fact. The following findings have not been appealed by MEC.
When St. John bought her home in Lolo on March 31, 1992, electrical service was provided through and billed from two separate meters. One meter measured consumption in the household, and the other meter measured consumption by the garage and swimming pool. MEC treated the charges separately and billed them separately.
Because the person who occupied the house before St. John bought it continued to live in the house after she bought it, that occupant continued to be responsible for electrical service for a period of time after St. John’s purchase. St. John first signed an agreement with MEC to pay for electrical service on August 12,1993. Seven days later, she was billed $2040 for electrical service provided to the pool area during that seven-day period of time. The only devices using electricity through the pool meter, however, were the electric light bulbs in the garage and the electricity for the pool. Even MEC believed at that time that the meter had to have been misread in order to generate such a substantial and unprecedented charge.
*323 In November, when St. John was again billed $2040, even after the pool had been closed and shut down for the winter, she disputed the amount that she was being charged. She continued to be billed for the fall amount through 1993, but was billed separately for her house and the electrical services provided to the pool. During this time, St. John continued to promptly pay all bills related to her house. In spite of that fact, on April 5, 1994, MEC transferred the $4154 balance attributable to the pool meter to her house meter account, and then demanded full payment within seven days and threatened to terminate electrical service if payment was not made. St. John did not make full payment, and the electrical service was disconnected.
When a friend restored unauthorized service to St. John’s house in order to avoid the extreme difficulties caused by the loss of her electricity, MEC discovered the unauthorized service and sought criminal prosecution of her for unauthorized use of electrical service. It then again terminated electrical service to her home.
It was under these circumstances that MEC then came to St. John and agreed to restore the electrical service, which was essential to the habitability of her home, on the condition that she sign a written agreement to pay the disputed amounts billed from her pool meter. She signed the promise to make monthly installments, but did not admit she was responsible for the disputed charges, and did not agree that the payment plan constituted a settlement of the dispute over the amount due for electricity provided to the pool area.
As if MEC’s conduct was not sufficiently reprehensible by this point in time, it then altered the agreement that St. John had signed, without her knowledge or approval, and added “ACCORD AND SATISFACTION” to the document. Not being sufficiently embarrassed by that impropriety, it then raised the document St. John signed as an actual accord and satisfaction in defense to this action.
The electric cooperative’s conduct in this case is nothing short of extortion, combined with deceit.
The predicament in which St. John found herself due to the bungling, overreaching, and manipulation by MEC was compounded by the fact that she could not switch to Montana Power Company for her service without MEC’s approval, which apparently was never given.
Under similar circumstances, the Supreme Court of Utah held that a public utility has a higher obligation to render services to the public than does an ordinary business. While, concededly, MEC is not a public utility, its status is similar in this case because of the monopoly *324 it had over electrical service to St. John. In Josephson v. Mountain Bell (Utah 1978), 576 P.2d 850, the public utility which provided telephone service to the plaintiff in that case terminated service to his home because he was delinquent in payment for his business phone. The Utah Court held, under the circumstances, that:
But it is our opinion that the defendant should not be permitted to use the pressure of imposing a penalty upon the home and the family by denying them a public service they are entitled to and paying for....
In accordance with what has been said above, we cannot see it as other than a deprivation of the plaintiffs of their rights to cut off their home phone service because charges on the separate business phone were delinquent. We therefore agree with plaintiffs’ contention that the disconnection of their home phone was wrongful.
Josephson, 576 P.2d at 852-53 (footnote omitted).
Based on the reasoning in Josephson, I would conclude, likewise, that an electric cooperative with a monopoly over service to its consumers cannot terminate one form of service which has been fully paid for in order to leverage payment for another service which is legitimately or otherwise disputed. Even though the service disputed in Josephson was to a business premises and the issue was whether service could be terminated to the plaintiff’s residence, the two services involved in this case had been treated just as separately by MEC prior to St. John’s dispute with the cooperative over service to the pool area.
Finally, I would conclude, as the court did in Trigg v. Middle Tennessee Electric Membership Corp. (Tenn. Ct. App. 1975), 533 S.W.2d 730, that a company supplying electricity to the public cannot terminate service to a customer for nonpayment when there is a bona fide dispute concerning the correctness of the bill. In that case, the Tennessee Court held that:
A company supplying electricity to the public has the right to cut off service to a customer for nonpayment of a just service bill and the company may adopt a rule to that effect. Annot., 112 A.L.R. 237 (1938). An exception to the general rule exists when the customer has a bona fide dispute concerning the correctness of the bill. Steele v. Clinton Electric Light & Power Co., 123 Conn. 180, 193 A. 613, 615 (1937); Annot. 112 A.L.R. 237, 241 (1938); see also *325 43 Am. Jur., Public Utilities and Services, Sec. 65; Annot., 28 A.L.R. 475 (1924). ...
... A public utility should not be able to coerce a customer to pay a disputed claim.
Trigg, 533 S.W.2d at 733.
While, once again, the rule applied in Trigg is normally applied to public utilities, the defendant in that case was the Middle Tennessee Electric Membership Corp., subject to the Electric Cooperative Law of Tennessee, as codified in Tenn. Code Ann. §§ 65-25-101 through -229 (1993). Furthermore, because of the monopolistic nature of MEC’s relationship with St. John, the rationale for the rule is the same in this case.
For these reasons, I concur with what has been said in the majority opinion; however, feel it is insufficient and would expand the opinion to include the conclusions set forth in this opinion.
JUSTICE HUNT joins in the foregoing specially concurring opinion.